UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARIA VELIKONJA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 03-832 (ESH) |
| ALBERTO GONZALES, Attorney General, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff alleges that her former employer, the Federal Bureau of Investigation ("FBI"), violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as a result of various referrals relating to allegations of time and attendance fraud. In two previous opinions, this Court dismissed Counts I and IV of plaintiff's complaint and granted summary judgment on the remaining counts. The D.C. Circuit affirmed except as to this Court's entry of judgment with respect to Count I insofar as it related to the second referral for investigation. *Velikonja v. Gonzales*, 466 F.3d 122, 123-24 (D.C. Cir. 2006). The parties have since conducted additional discovery relating to this remaining claim, and defendant has now moved for summary judgment. For the reasons explained herein, defendant's motion will be granted.

## BACKGROUND

**I.  Factual History**

The facts will be recounted briefly here, as they have been exhaustively discussed in the Court's four prior opinions in this case and in a related one (Civ. Action No. 04-1001) that was dismissed on *res judicata* and exhaustion grounds. *See Velikonja v. Mueller*, 315 F. Supp. 2d 66

(D.D.C. 2004) ("*Velikonja I*"); *Velikonja v. Mueller*, 362 F. Supp. 2d 1 (D.D.C. 2004) ("*Velikonja II*"), aff'd, 466 F.3d 122 (D.C. Cir. 2006); *Velikonja v. Ashcroft*, 355 F. Supp. 2d 197 (D.D.C. 2005) ("*Velikonja III*"), aff'd, 466 F.3d 122 (D.C. Cir. 2006); *Velikonja v. Gonzales*, Civ. No. 04-1001, 2005 U.S. Dist. LEXIS 43780 (D.D.C. June 30, 2005) ("*Velikonja IV*"), aff'd, 466 F.3d 122 (D.C. Cir. 2006).

Plaintiff Maria Velikonja began her employment at the FBI in 1985.  (Pl.'s Opp'n Ex. A [Feb. 15, 2001 Velikonja Stmt.] at 1.)  In November 1997, she began working as a Supervisory Special Agent in the Finance Division at FBI Headquarters in Washington, D.C.  (Pl.'s Opp'n Ex. C [July 16, 2002 Velikonja Stmt.] at 3.)  She joined the National Security Law Unit ("NSLU") of the FBI's Office of the General Counsel ("OGC") in January 2000.  (*Id.*)  Her supervisor there was Michael Woods.  (Pl.'s Opp'n Ex. A at 2.)  In the spring of 2000, Woods became concerned about discrepancies between the hours plaintiff claimed she worked on her time sheets and the actual time she was seen working at the NSLU workplace.  (Oct. 23, 2003 Zimmerman Decl. Ex. G [Feb. 22, 2001 Woods Stmt.] at 2-3.)  Woods and his supervisor, Spike Bowman, began to monitor the time of plaintiff's arrivals.  (*Id.* at 3.)  In July 2000, Woods obtained the building's electronic records so that he could compare the times at which plaintiff entered the building to the times at which she reported arriving.  (*Id.* at 4.)  He compiled a chart noting the discrepancies he observed between the electronic logs and plaintiff's self-reported time in the office.  (*Id.*; *see also* July 19, 2004 Zimmerman Decl. Ex. A [July 19, 2000 Woods Mem.].)

Based on his findings, Woods had a meeting with plaintiff and wrote a memorandum to her summarizing his concerns and inviting her to respond to them by the next day.  (Oct. 23, 2003 Zimmerman Decl. Ex. G at 4; July 19, 2004 Zimmerman Decl. Ex. B [July 20, 2000

Woods Mem.].)  Plaintiff responded by letter the same day, explaining that she typically rounded her time to the nearest hour or half-hour and often performed work without being physically present within NSLU.  (Oct. 23, 2003 Zimmerman Decl. Ex. B [July 20, 2000 Velikonja Mem.] ¶¶ 2, 6.)

During a routine inspection of OGC in 2000, the FBI's Inspection Division discovered Woods' records regarding plaintiff's time and attendance discrepancies and determined that the matter should be referred to the Office of Professional Responsibility ("OPR").  (Def.'s Facts ¶ 4.)  OGC referred the matter to OPR on November 7, 2000.  (*Id.* ¶ 5.)  Plaintiff contacted an EEO counselor at that time, but did not file a complaint.  (Pl.'s Opp'n Ex. F at 3215.)

According to defendant, beginning in April 2001, plaintiff's supervisors again noticed plaintiff's absences from the office, particularly in the early afternoon.  (Def.'s Facts ¶ 6; Pl.'s Opp'n Ex. S [Jan. 30, 2002 O'Connor Letter] at 13.)  Woods obtained the electronic records of plaintiff's entry to the building between April 2, 2001 and April 17, 2001, and compared those records with plaintiff's self-reported times.  (Def.'s Facts ¶ 7.)  Woods uncovered discrepancies that he felt could not be explained to his satisfaction by any authorized work from home.  (Pl.'s Opp'n Ex. T [July 9, 2001 Woods Mem. to OPR] at 2-3.)  OGC relayed this information to OPR in a memo dated July 9, 2001.  (*Id.* at 2-3; *see* Pl.'s Facts ¶ 14.)

On May 13, 2001, plaintiff was assigned to temporary duty in Macedonia.  (Def.'s Facts ¶ 9.)  Although the duty was intended to last until September 2001, plaintiff returned to the United States on June 25, 2001, due to dangerous conditions in Macedonia.  (Pl.'s Opp'n Ex. C at 18.)  Plaintiff did not report back to NSLU until July 23, 2001.  (*Id.* at 19.)  She stated that she was continuing to work on preparing a training course for Macedonians, but that Woods had advised her not to return to NSLU until she was sure that her temporary duty assignment had

been completed. (*Id.* at 18.) She further stated that her office within NSLU was unavailable, as it was being used by another OGC unit, and that she had taken a number of days of administrative leave approved by her overseas supervisors. (*Id.* at 18-19.) Woods, however, concluded that plaintiff performed little or no work during this period for either NSLU or the foreign office, and that she intentionally deceived her supervisors in Macedonia into thinking that she was under the supervision of NSLU and vice versa. (May 18, 2007 Zimmerman Decl. Ex. 3 [July 25, 2001 Woods Mem.] at 2.)

Citing concerns about her "veracity and trustworthiness" in the face of the sensitive information handled within the NSLU, OGC transferred plaintiff against her will from the NSLU to the Procurement Law Unit on July 25, 2001. (July 19, 2004 Zimmerman Decl. Ex. G [Parkinson Stmt.], at 3-4; Pl.'s Opp'n Ex. C at 19-20.) OGC notified OPR that it believed Velikonja had committed additional misconduct (July 19, 2004 Zimmerman Decl. Ex. E [Schiera Stmt.] at 3-4), and it formally referred the additional violations to OPR for investigation in October 2001. (May 18, 2007 Zimmerman Decl. Ex. 1 [Mem. from OPR to OGC].) OPR decided to process this second referral as a new investigation instead of consolidating it with the first referral from November 2000. (July 19, 2004 Zimmerman Decl. Ex. E at 4; Def.'s Facts ¶ 18.)

On August 23, 2001, OGC announced that it was establishing a new Foreign Intelligence Surveillance Act ("FISA") unit within NSLU and invited employees interested in applying for the position of Acting Chief of the new unit to respond by return e-mail. (Pl.'s Opp'n Ex. I). Plaintiff responded to Kathy Eckman, an OGC secretary, that she "might be interested in applying" for the position. (*Id.*) Plaintiff does not claim that she ever actually applied for this

position.  (*See* Pl.'s Opp'n at 11.)  In November 2001, another employee was selected for the FISA job.  (Am. Comp. ¶ 37; July 19, 2004 Zimmerman Decl. Ex. G at 4.)

Plaintiff claims to have met with an EEO counselor on July 25, 2001 (Am. Compl. ¶ 48), but the EEO records reveal that she first made contact with the EEO counselor on July 25, and her initial interview with the counselor was not until July 27, 2001.  (Pl.'s Opp'n Ex. F at 3210, 3215.)  Plaintiff filed a formal complaint of discrimination on November 6, 2001.  (Pl.'s Opp'n Ex. N.)  Among other issues raised in the complaint, plaintiff alleged that the time and attendance controversy resulted in her inability to become Acting Unit Chief of the new FISA unit.  (*Id.* at 4.)

OPR concluded the first referral on January 30, 2002, and it determined that plaintiff had committed multiple violations of FBI policies.  (Pl.'s Opp'n Ex. S at 1.)  Based on its findings, the FBI suspended plaintiff for fourteen days and placed her on one year of probation.  (*Id.* at 13.)  Plaintiff resigned on September 9, 2003.  (Def.'s Facts ¶ 22.)  As a result of her resignation, OPR did not complete the second investigation.  (Def.'s Facts ¶ 23.)

**II.    Procedural History**

On April 3, 2003, plaintiff filed the initial complaint in this case, which was subsequently amended on September 2, 2003.  Counts I through IV of the Amended Complaint alleged violations of Title VII:  (1) Count I alleged that plaintiff's time and attendance were subject to "special scrutiny" -- in the form of the two OPR referrals -- because she is a woman and because she had engaged in protected activity; (2) Count II alleged that OPR's investigations were delayed for discriminatory and retaliatory reasons; (3) Count III alleged "disparate discipline," claiming that the suspension and probation resulting from the first investigation were excessive and were imposed because of her gender; and (4) Count IV alleged that defendant violated Title

VII by denying her due process rights in the disciplinary proceedings. (Am. Compl. ¶¶ 50-60.) Count V alleged a violation of plaintiff's First Amendment rights, and Count VI alleged a violation of the Privacy Act. (*Id.* ¶¶ 61-65.)

In an opinion issued on April 13, 2004, this Court dismissed Count I as to the first referral and Count IV in its entirety for failure to exhaust. *Velikonja I*, 315 F. Supp. 2d at 73-75. It dismissed Count I as to the second referral because it held that the referral did not constitute an adverse action. *Id.* at 75. On December 21, 2004, the Court granted summary judgment on the remaining counts. *Velikonja II*, 362 F. Supp. 2d at 25.

On June 18, 2004, while the first action was pending, plaintiff initiated a second suit alleging retaliation under Title VII and constructive discharge. In an opinion issued on January 6, 2005, this Court held that all claims based on facts that occurred before the filing of the initial complaint were barred by *res judicata*. *Velikonja III*, 355 F. Supp. 2d at 204. Then, on June 30, 2005, it dismissed the remaining claims for failure to exhaust administrative remedies. *Velikonja IV*, 2005 U.S. Dist. LEXIS 43780, at *1.

Plaintiff appealed both cases to the D.C. Circuit. While upholding the judgments of this Court in every other respect, it remanded Count I of the first complaint only insofar as it applied to the second referral to OPR. *Velikonja*, 466 F.3d at 123-24. The Court found that plaintiff's allegation that the second referral was made for the purpose of preventing her from receiving promotions was sufficient to state a claim for gender discrimination and for retaliation, particularly in light of the Supreme Court's intervening decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), which redefined what constitutes the requisite injury or harm for the purpose of a Title VII retaliation claim. *Id.* at 124.

Defendant has now moved for summary judgment, arguing (1) that plaintiff cannot establish a *prima facie* case of discrimination or retaliation based on the second OPR referral, and (2) that plaintiff has failed to adduce any evidence to suggest that defendant's proffered reason for the second referral was a pretext for discrimination or retaliation.  (Def.'s Mem. at 3.)

**ANALYSIS**

**I.     Legal Standard for Title VII Claims**

After four years of prolonged litigation, the only claim that remains is plaintiff's allegation in Count I that the second referral from OGC to OPR was both discriminatory and retaliatory in violation of Title VII.  *Velikonja*, 466 F.3d at 124.  Under the test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  To establish a *prima facie* case of discrimination under Title VII, plaintiff must show that she is a member of a protected class, that she suffered an adverse employment action, and that the unfavorable action gives rise to an inference of discrimination. *E.g.*, *Vickers v. Powell*, No. 06-5016, 2007 WL 1952369, at *5 (D.C. Cir. July 6, 2007).  To establish a *prima facie* case of retaliation under Title VII, plaintiff must show that she engaged in a protected activity and that as a consequence, her employer took a materially adverse action against her.  *E.g.*, *Weber v. Batista*, No. 05-5309, 2007 WL 2033254, at *4 (D.C. Cir. July 17, 2007).

If the plaintiff succeeds in stating a *prima facie* case, the burden then shifts to the defendant who must "'produc[e] evidence' that the adverse employment action[] [was] taken 'for a legitimate, nondiscriminatory reason.'"  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Burdine*, 450 U.S. at 254).  The defendant's burden at this stage is only one of

production; it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. If the defendant satisfies its burden, "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [i]s discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). Plaintiff then has the burden of persuasion to show that defendant's proffered nondiscriminatory reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256.

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997). Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. However, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)). Rather, the issue is "whether the employer honestly believes in the reasons it offers." *Id.*

## II.    Adverse Employment Action or Material Harm

In its opinion overturning this Court's dismissal of Count I as it related to the second OPR referral, the Court of Appeals focused on plaintiff's allegation that "FBI officials referred [her] to OPR in order to prevent [her] from receiving promotions until the OPR complaints are finally resolved." *Velikonja*, 466 F.3d at 124. Reasoning that the denial of a promotion constitutes an injury that would support a *prima facie* case for discrimination and retaliation, it

held that plaintiff's discrimination and retaliation claims relating to the second referral were sufficient to survive a motion to dismiss.  *Id.*  It is now clear, however, that plaintiff's allegation that the second referral was made for the purpose of preventing her from receiving a promotion is baseless.  Plaintiff had *already* been referred to OPR in November 2000 for time and attendance violations, and an investigation or adjudication, which ultimately resulted in substantial disciplinary measures, was already pending at the time of the second referral.  (Def.'s Facts ¶¶ 5, 19; Pl.'s Facts ¶ 19.)  According to plaintiff, "[w]hen a referral is made to OPR, an agent's career is placed on hold, and she becomes unable to obtain promotions or transfers because of the pending OPR investigation."  (Pl.'s Opp'n at 14.)  Thus, whatever "cloud" an OPR referral casts over the career prospects of an FBI employee was already hanging over plaintiff prior to the second referral.  (*See* Am. Compl. ¶¶ 40, 55.)  Given the already existing "cloud," it defies logic to argue that plaintiff's supervisors made the second referral for the purpose of stunting her career growth.

Second, the only specific promotion plaintiff claims to have been denied as a result of the second referral to OPR is the FISA Acting Unit Chief position, though plaintiff has not presented any evidence that she even formally applied for the position.  (Pl.'s Opp'n at 11.)  However, even without the second referral, plaintiff's prospects for receiving this promotion already had to have been severely damaged, for she was already under investigation by OPR for time and attendance violations, and her supervisors in NSLU already suspected her of further violations.  Her own EEO administrative complaint alleges that her failure to get the FISA promotion was a result of *both* OPR referrals and her removal from NSLU.  (Pl.'s Opp'n Ex. N at 3-4.)  Plaintiff therefore fails to show how the second referral could have caused her to not be promoted to the

FISA position.[1]  She points to no other specific promotions that she was denied as a result of the second referral (*see* Pl.'s Opp'n at 17), and it is impossible to see how there could be any.  Just two months after the FISA position was filled, plaintiff was disciplined and placed on probation as a result of the first investigation.  (Pl.'s Opp'n Ex. S at 13.)  This serious blemish on plaintiff's employment record would presumably have made it difficult, if not impossible, for plaintiff to be promoted within the FBI, regardless of whether a second referral was still pending at OPR.

Furthermore, because plaintiff resigned from the FBI before the second investigation was completed, the second referral did not result in any additional disciplinary action, and thus, it ultimately had no practical consequence for her employment at the FBI.[2]

---

[1]   Plaintiff makes much of Woods' alleged involvement in her nonselection for the FISA Acting Unit Chief position, and claims that General Counsel Larry Parkinson "relied heavily" on input from Woods when making his decision.  (*See* Pl.'s Opp'n at 11.)  This claim is not factually supported by the record before the Court.  (*See* Pl.'s Opp'n Ex. J [Parkinson Dep.] at 74:18-21 ("Q:  So when you say that you didn't think Maria was reliable, you're relying on what Woods is telling you; is that right?  A:  I don't know if I said that.").)

Moreover, the extent of Woods' involvement in the selection of a candidate for the FISA position is legally irrelevant to plaintiff's discrimination and retaliation claims.  The issue before the Court is whether Woods acted for discriminatory or retaliatory reasons when he decided months earlier to refer plaintiff to OPR a second time for time and attendance violations.  Plaintiff improperly conflates the referral -- which she claims was made to prevent her from receiving promotions -- with the nonselection itself.  In fact, plaintiff's intimation that a negative review from Woods doomed her candidacy actually undermines her argument that her nonselection followed inevitably from the second OPR referral:  If plaintiff's career was effectively "placed on hold" as a result of the second OPR investigation, she would have been out of the running for the FISA job regardless of what Woods told Parkinson.  And, to the extent that plaintiff now tries to base a Title VII claim on the November 2001 nonselection, such a claim cannot now be raised.  *See Velikonja II*, 362 F. Supp. 2d at 7 n. 2.

[2]   Plaintiff also argues that "the secret monitoring of [her] time and attendance" constitutes an adverse employment action and a material harm under *White*.  (Pl.'s Opp'n at 16.)  However, the Court of Appeals' remand encompassed only the second referral to OPR (*Velikonja*, 466 F.3d at 124), so that is the only issue before this Court.  Moreover, the Court doubts that the mere monitoring of an employee's time and attendance by a supervisor could ever constitute the requisite "material or significant" harm for a Title VII claim, even under *White*, as it is, at worst,

### III.   Causal Connection

In addition, with respect to her retaliation claim relating to the second referral, plaintiff has presented nothing to connect Woods' decision to report her time and attendance violations to OPR with his knowledge of any protected activity. A plaintiff bringing a retaliation claim has the burden of establishing that a "causal connection" exists between a protected activity and the employment action. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). A "causal connection . . . may be established by showing that the employer had *knowledge* of the employee's protected activity, and that the adverse . . . action took place shortly *after* that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985) (emphasis added). Plaintiff argues that the second referral, which she claims occurred on October 9, 2001, was made in retaliation for her contact with an EEO counselor on July 25, 2001 and her subsequent pursuit of EEO remedies, and that the temporal proximity between the protected activity and the referral was close enough to establish causation. (Pl.'s Opp'n at 19.) However, even if the second referral to OPR was not transmitted until October 2001, the decision to refer plaintiff to OPR a second time was clearly made in July 2001 after Woods concluded that plaintiff appeared to have been absent without leave after her return from Macedonia. A memorandum addressed to OPR dated July 27, 2001, drafted by Woods, detailed the allegations of time and attendance fraud and absence without leave. (*Id.* Ex. 2 [July 27, 2001 Parkinson Mem.]). The memorandum stated that "OGC is referring [] allegations of time and attendance fraud and/or absence without leave to OPR," and according to this document, it was during a conversation with plaintiff's overseas

---

one of the "minor annoyances that often take place at work and that all employees experience." *White*, 126 S. Ct. at 2415. This is especially true given plaintiff's nonsensical claim that the monitoring was done in "secret," since it would be impossible for such monitoring to constitute a material harm within the meaning of *White* if the employee was not even aware that she was the subject of any monitoring.

supervisor on July 23, 2001, that "it became apparent" to Woods that plaintiff "had not accurately represented her situation" to either NSLU or her overseas supervisors, and that as a result, neither department was assigning her any work.  (*Id.* at 3.)  On July 24 (which was prior to any protected activity), Woods wrote an e-mail in which he stated: "I believe that for the past two weeks, Maria has been AWOL much of the time, letting IOS [the International Operations Section] believe she was working in NSLU, and letting NSLU believe she was working for IOS. . . . I am outraged at this behavior. . . . I am more than ready to take the necessary administrative measures to address this."  (Pl.'s Opp'n Ex. EE [July 24, 2001 Woods E-mail].)  On July 25, 2001, Woods met with his supervisors to discuss plaintiff's situation, and during that meeting it was decided to transfer plaintiff out of NSLU because of "persistent concerns over her trustworthiness and candor."  (May 18, 2007 Zimmerman Decl. Ex. 2 at 4.)  A further memo by Woods on July 25, 2001, states that at around 10:00 a.m. that day Woods met with plaintiff, asked her to "explain her situation for the past two weeks," and told her that he "believed that she had intentionally maintained a situation in which IOS believed she was working for NSLU, and NSLU believed she was working for IOS, and had spent the last two weeks doing little or no work." (May 18, 2007 Zimmerman Decl. Ex. 3 at 1-2.)  Lynne Schiera, an attorney-advisor in OPR, wrote in a sworn statement that "in July 2001, OPR was advised by the Office of General Counsel (OGC), where Ms. Velikonja was assigned, that she may have committed additional T&A misconduct."  (July 19, 2004 Zimmerman Decl. Ex. E at 3-4.)

 In response to this wealth of uncontroverted evidence, plaintiff cannot argue that Woods knew that she had contacted an EEO counselor before he made the decision to refer plaintiff to OPR.  On the contrary, it is clear from the record that Woods had already made up his mind to report the latest discrepancies to OPR before plaintiff's July 25 initial EEO contact.  Indeed, the

EEO records indicate that plaintiff scheduled her July 27, 2001 EEO interview in part *because* of the impending second referral. (*See* Pl.'s Opp'n Ex. F at 3210, 3216 (stating that plaintiff was informed by Woods on July 25, 2001, that her supervisors had "lost confidence in her due to the T&A issue and were going to make a referral to OPR," and that "[o]n 7/25/2001 . . . , the aggrieved met with EEO counselor and advised of the above events").) Similarly, plaintiff's EEO administrative complaint reveals that she "was advised by UC Michael Woods on 7/25/01 that he would be making another referral to OPR based on [her] time and attendance during the time she was TDY to the International Operations Section (IOS)." (Pl.'s Opp'n Ex. N at 3.) Regardless of when the referral to OPR was actually transmitted, because the decision to refer the time and attendance allegations against plaintiff to OPR was made prior to (or at least simultaneous to) her EEO contact, and because the record indicates that Woods could not have known of plaintiff's EEO activity when he decided to make the referral, plaintiff cannot support a claim for retaliation. *See Horne v. Reznick, Fedder & Silverman*, 154 Fed. App. 361, 364 (4th Cir. 2005) ("[S]ince . . . [defendant] was preparing to discharge [plaintiff] before [plaintiff] contacted any of the civil rights offices, it is not a permissible inference that [plaintiff] was discharged because he contacted those offices." (quoting *McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir. 1997)) (internal quotation marks omitted)); *Welzel v. Bernstein*, 436 F. Supp. 2d 110, 128 (D.D.C. 2006) (dismissing claim for retaliatory discharge where supervisor had already "made up his mind that plaintiff would have to go, and this decision was reached prior to his hearing of plaintiff's filing of an EEO complaint"); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 30 (D.D.C. 2004) ("Because [plaintiff's] supervisors' dissatisfaction with his performance and their intentions to terminate him predated his protected activity, his retaliatory discharge claim is illogical and must be dismissed.").

**IV.     Claim of Pretext**

Moreover, even assuming *arguendo* that plaintiff could state a *prima facie* case for retaliation and discrimination, which she cannot, her claims must fail because she has not adduced *any* evidence that would allow a reasonable juror to determine that defendant's proffered reason for the second referral was a pretext for discrimination. Here, defendant has offered a legitimate, non-discriminatory reason for its actions, producing considerable evidence to show that OGC made the second referral to OPR because plaintiff's supervisors concluded that she performed little or no work upon her return from Macedonia and because the Inspection Division had previously made clear that time and attendance discrepancies involving plaintiff had to be referred to OPR. *See Velikonja I*, 315 F. Supp. 2d at 78-79. As Parkinson explained:

> Upon her immediate return [from Macedonia], she did not report to the NSLU. . . . I discussed at some length this latest matter involving Ms. Velikonja's [time and attendance] with [deputy general counsel] Bowman and [unit chief] Woods. I remembered that the inspection division had criticized the OGC for not referring the previous allegations of [time and attendance] fraud involving Ms. Velikonja in a timely manner to the OPR. With that in mind, and given Ms. Velikonja's history of suspected [time and attendance] abuse, I decided that these latest allegations should be referred to OPR.

(July 19, 2004 Zimmerman Decl. Ex. G at 5.) Similarly, Woods explained:

> I indicated that she had, as far as I was concerned, crossed a line with her latest behavior. I indicated that I believed she had intentionally maintained a situation in which IOS believed she was working for NSLU, and NSLU believed she was working for IOS, and had spen[t] the last two weeks doing little or no work. I indicated that, based on her history in NSLU, I had lost all trust in her, that I felt I needed to verify anything she told me about her work and her hours. . . . I told her that this history, coupled with her behavior since returning from Macedonia, had destroyed my ability to trust anything she said about these issues. I told her that the limits of my tolerance for her behavior, which had, in my view, been overly generous, finally had been exceeded.

(May 18, 2007 Zimmerman Decl. Ex. 3 at 2.)  Similar misconduct has consistently been held to be legitimate, non-discriminatory grounds for adverse employment actions.  *See Moorehouse v. Billington*, Civ. No. 04-129, 2006 WL 3747311, at *5 (D.D.C. Dec. 18, 2006); *Edwards v. EPA*, 456 F. Supp. 2d 72, 89, 90, 93 (D.D.C. 2006).

In her opposition, plaintiff expends considerable effort arguing that she did not violate the FBI's time and attendance policies, that she was not required to report to NSLU upon her return from Macedonia, and that she was working from home after her return from Macedonia.  (*See* Pl.'s Opp'n at 4, 20-21 ("[T]here are disputes of material fact as to whether Velikonja ever violated the FBI's rules governing time and attendance.").)  However, whether her supervisors were ultimately correct in their belief that plaintiff was violating the policies is totally irrelevant.  "Once the employer has articulated a non-discriminatory reason for its action, . . . the issue is not the correctness or desirability of the reasons offered, but whether the employer honestly believes in the reasons it offers."  *Fischbach*, 86 F.3d at 1183 (internal quotation marks, modifications, and ellipses omitted).  To survive summary judgment, plaintiff must offer evidence upon which a reasonable jury could conclude that the FBI decision-makers did not rely in good faith upon the reasons given for the second OPR referral.  *See id.*  This Court has repeatedly instructed plaintiff that she must do more than attack the merit of defendant's underlying charges against her.  *See Velikonja II*, 362 F. Supp. 2d at 8 ("While plaintiff might be right that the FBI *erroneously* found her behavior to be much more egregious than it actually was and that this error in judgment le[d] to an excessively severe disciplinary action, this is simply not the relevant inquiry.  Whether the situation seems unfair to plaintiff is not the issue under Title VII."); *Velikonja I*, 315 F. Supp. 2d at 81 ("[I]t is important to note that plaintiff's case may not turn on the accuracy of the

allegations against her that led to her discipline . . . ."). These admonitions appear to have fallen on deaf ears.

In her opposition, plaintiff lists twenty-four ways in which a jury could supposedly find that defendant did not actually rely upon the suspected time and attendance violations in referring her to OPR. (*See* Pl.'s Opp'n at 23-27.) With the exception of the last item, however, all of these arguments relate to the accuracy of the allegations against plaintiff or the fairness of the way in which the referrals were handled. Woods states that he determined that plaintiff was again violating time and attendance policies based on discrepancies between electronic time records and self-reported time and based on discussions with plaintiff's overseas supervisors. (Pl.'s Opp'n Ex. S at 13; May 18, 2007 Zimmerman Decl. Ex. 2 at 2-3; Pl.'s Opp'n Ex. EE.) Even if plaintiff had an explanation for each of the supposed discrepancies, and even if an OPR investigation later determined that Woods was incorrect and that plaintiff was not guilty of any misconduct, these observations (especially when coupled with plaintiff's prior problems) were more than sufficient to support a supervisor's objectively reasonable belief that the matter should be referred for further investigation. Therefore, a reasonable juror cannot infer discriminatory or retaliatory intent from the second referral based on alleged flaws in the ultimate merit of Woods' assessment of plaintiff's time and attendance discrepancies.[3] *See Laboy v. O'Neill*, 180 F. Supp. 2d 18, 28 (D.D.C. 2001).

---

[3] The only other allegation in plaintiff's opposition is that "Woods told Velikonja that [she] was in big trouble because of what she told OPR about him." (Pl.'s Opp'n at 27.) This is hardly evidence of either protected activity or retaliation. Moreover, the record does not support this allegation. The only evidence that plaintiff cites is her own EEO administrative complaint, where she alleged that Woods "said that he had kept 'book' on me again in April and May, 2001, that he had to do a lot of work because of what I apparently had told the OPR investigators about him, and that I was in 'big trouble.'" (Pl.'s Opp'n Ex. N at 2.) Plaintiff's administrative complaint does not claim, as plaintiff would like the Court to believe, that Woods told her that she was in "big trouble" *because* she had spoken with OPR investigators about Woods. Read in

In sum, because plaintiff has failed to present sufficient evidence suggesting that defendant's legitimate, non-discriminatory reason for initiating the second referral to OPR was a pretext for discriminatory or retaliatory animus, no reasonable juror could conclude that she was referred for an impermissible reason.[4]  Accordingly, plaintiff's discrimination and retaliation claims in Count I relating to the second referral must be dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [Dkt. # 74] is granted, and plaintiff's complaint is dismissed with prejudice.  A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: August 15, 2007

---

context, a more plausible interpretation of the administrative complaint is that Woods stated that plaintiff was in big trouble with OPR because of her repeated time and attendance violations, which were being referred to OPR for a second time.

[4]     Weeks after briefing was completed on defendant's motion for summary judgment, plaintiff filed a motion to supplement the record with the declaration of Max Fratoddi [Dkt. # 79], who was responsible for the selection of plaintiff for the 2001 temporary duty in Macedonia. The declaration states only that two FBI employees in the "front office" of the International Operations Section -- Les Kaciban and Walt Smith -- "objected to the selection of Ms. Velikonja [for the Macedonia post] for reasons that were unclear," and they sought to "persuade and pressure" Fratoddi to select another candidate, but he refused. (Fratoddi Decl. ¶¶ 3-4.)  These facts, which do not relate to the second OPR referral, *are completely irrelevant* to any of the claims now before the Court.